Slip Op. 11-20

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| MARSAN GIDA SANAYI VE TICARET A.S.,<br><br>                              Plaintiff,<br><br>              v.<br><br>UNITED STATES,<br><br>                              Defendant. | Before: Richard W. Goldberg,<br>Senior Judge<br>Court No. 09-00483 |

## OPINION

[Plaintiff's Motion for Judgment on the Agency Record is denied and the final results of the countervailing duty changed circumstances review are sustained.]

Dated: February 16, 2011

Law Offices of David L. Simon (David L. Simon), for the Plaintiff.

Tony West, Assistant Attorney General; Jeanne E. Davidson, Director; Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Joshua E. Kurland); Office of the Chief Counsel for Import Administration, U.S. Department of Commerce (Deborah R. King), Of Counsel, for the Defendant.

**Goldberg, Senior Judge:** Marsan Gida Sanayi ve Ticaret A.S. ("Marsan" or

"Plaintiff"), a Turkish producer and exporter of pasta brought this appeal to contest the final

results of the changed circumstances review of the countervailing duty order on pasta from

Turkey, published as Certain Pasta from Turkey: Final Results of Countervailing Duty Changed

Circumstances Review, 74 Fed. Reg. 54,022 (Dep't Commerce Oct. 21, 2009) ("Final Results").

The changed circumstances review examined whether Marsan was the successor-in-interest to

Gidasa for countervailing duty cash deposit purposes.  Commerce determined that Marsan was

not the successor to Gidasa.  <u>Id.</u> at 54,023.[1]  Consequently, Commerce determined that Marsan's

merchandise was not entitled to Gidasa's countervailing duty cash deposit rate, and instead,

should enter under the "all others" cash deposit rate of 9.38 percent.  <u>Id.</u>  Marsan challenges the

methodology Commerce employed and its final determination as unsupported by substantial

evidence and contrary to law.

### Background

**A. Commerce's Position on CVD CCRs**

In December 2006, several years prior to Marsan's petitions for an antidumping ("AD")

and countervailing duty ("CVD") changed circumstances review ("CCR"), Commerce stated it

might change the successor-in-interest analysis for CVD CCRs.  <u>See</u> <u>Stainless Steel Sheet and</u>

<u>Strip in Coils from the Republic of Korea: Preliminary Results of Countervailing Duty Changed</u>

<u>Circumstances Review</u>, 71 Fed. Reg. 75,937 (Dep't Commerce Dec. 19, 2006) ("<u>Stainless</u>

<u>Steel</u>").

Thus, in January 2007, Commerce published a Federal Register notice indicating its

intention to change the successorship analysis in CVD CCRs.  <u>Countervailing Duty Changed</u>

<u>Circumstances Reviews: Request for Comment on Agency Practice</u>, 72 Fed. Reg. 3,107 (Dep't

Commerce Jan. 24, 2007) ("<u>Request for Comment</u>").  At that time, Commerce applied the same

criteria for both AD and CVD successor-in-interest CCRs to examine whether an alleged

successor and predecessor company were the same business entity.  Commerce's criteria

---

[1] Commerce determined that Marsan was the successor to Gidasa for antidumping duty cash deposit purposes. <u>Certain Pasta from Turkey: Notice of Final Results of Antidumping Duty Changed Circumstances Review</u>, 74 Fed. Reg. 26,373 (Dep't Commerce June 2, 2009).

compared the companies' (1) management; (2) production facilities; (3) supplier relationships; and (4) customer base before and after the changed circumstances. Id. at 3,108. Commerce stated it may not be appropriate to use the same analysis, given that AD and CVD determinations focus on different issues. Id. Commerce noted the analysis focused on pricing behavior, which is less relevant in the CVD context where subsidization, not price discrimination, is the analytical focus. Id.

According to Commerce, "an examination that focuses largely or solely on changes in the legal or managerial structure or the productive capacity of a company may overlook other important considerations that also may be relevant in the context of subsidies and countervailing duties." Id. In response to the Request for Comment, Commerce received comments from two parties, which were summarized in the Preliminary Results of Marsan's CVD CCR, published as Certain Pasta from Turkey: Preliminary Results of Countervailing Duty Changed Circumstances Review, 74 Fed. Reg. 47,225 (Dep't Commerce Sept. 15, 2009) ("Preliminary Results").

### B. Marsan's CVD CCR

In August 2007, the Sabanci Group, a Turkish conglomerate and then-owner of Gidasa, agreed to sell Gidasa to MGS Marmara Gida for cash. In March 2008, the parties finalized the agreement. In June 2008, Gidasa's new shareholders changed the name of the company to Marsan. In December 2008, Marsan filed petitions requesting that Commerce conduct CCRs for both the AD and CVD orders on pasta from Turkey.[2] Marsan asserted it was the successor-in-

---

[2] Notice of Countervailing Duty Order: Certain Pasta from Turkey, 61 Fed. Reg. 38,546 (Dep't Commerce July 24, 1996); Notice of Antidumping Duty Order and Amended Final Determination of Sales at Less Than Fair Value: Certain Pasta From Turkey, 61 Fed. Reg. 38,545 (Dep't Commerce July 24, 1996).

interest to Gidasa for purposes of those orders.  Thus, Marsan claimed it was entitled to Gidasa's

AD and CVD cash deposit rates.

On January 28, 2009, Commerce published its Notice of Initiation regarding Marsan's

CVD CCR.[3]  Notice of Initiation of Countervailing Duty Changed Circumstances Review:

Certain Pasta from Turkey, 74 Fed. Reg. 4,938 (Dep't Commerce Jan. 28, 2009) ("Notice of

Initiation").  Commerce reiterated that the successor-in-interest test used in AD and CVD CCRs

might not "fully address whether it is appropriate to apply the CVD cash deposit rate of a

previously examined company" to a different company claiming to be its successor.  Id. at 4,939.

Referencing its language from Stainless Steel and its Request for Comment, Commerce

specifically stated that it did not intend to apply the AD CCR successor-in-interest methodology

in Marsan's CVD CCR to determine whether Marsan was the successor to Gidasa for CVD cash

deposit purposes.  Id.

In September 2009, Commerce published the Preliminary Results of Marsan's CVD

CCR.  Commerce announced that, in consideration of the comments it received, and drawing on

the Department's experience, it would be utilizing a new successor-in-interest methodology for

CVD CCRs, including Marsan's CVD CCR.  Preliminary Results, 74 Fed. Reg. at 47,227.

Under the new CVD CCR successor-in-interest methodology, Commerce makes "an affirmative

CVD successorship finding (i.e., that the successor company is the same subsidized entity for

CVD cash deposit purposes as the predecessor company) where there is no evidence of

significant changes in the respondent's operations, ownership, corporate or legal structure" that

---

[3] Commerce also published a Notice of Initiation for the AD CCR in January 2009. Notice of Initiation of Antidumping Duty Changed Circumstances Review: Certain Pasta from Turkey, 74 Fed. Reg. 681 (Dep't Commerce Jan. 7, 2009).

could have affected the nature and extent of the company's subsidy levels. Id. Commerce

provided a non-exhaustive list of the changes it considered "significant and would affect the

nature and extent of the requesting party's subsidization: (1) changes in ownership, other than

regular buying and selling of publicly owned shares held by a broad array of investors; (2)

corporate mergers and acquisitions involving the respondent's consolidated or cross-owned

corporate family and outside companies; and (3) purchases or sales of significant productive

facilities." Id. at 47,227-28.

     In addition, under the new methodology, where a change occurs in a company's

operations, ownership, corporate, or legal structure that is not reflected in the abovementioned

non-exhaustive list, Commerce will assess whether the "change could affect the nature and

extent of the respondent's subsidization." Id. at 47,228. Commerce outlined additional non-

exhaustive, objective criteria for this assessment: "(1) [c]ontinuity in the cross-owned or

consolidated respondent company's financial assets and liabilities; (2) continuity in its

production and commercial activities; and (3) continuity in the level of the government's

involvement in the respondent's operations or financial structure (*e.g.*, government ownership or

control, the provision of inputs, loans, equity)." Id. According to Commerce, the particular

criteria "better reflect [the] aspects of a company that are most impacted by, the target of, or the

vehicle for subsidy benefits." Id. Commerce also highlighted that the successor-in-interest

analysis focuses on whether a significant change occurred and not whether those changes, in

fact, affected a company's subsidization. Id.

Using the new criteria, Commerce preliminarily determined that Marsan was not the successor to Gidasa for CVD cash deposit purposes because there was a significant change in the company's operations, ownership, corporate, or legal structure.  Commerce reasoned that the change in ownership was a significant change because new investors and a new corporate entity owned and controlled all of Gidasa's assets, including its facilities and brand names.  Id. According to Commerce, these changes "could impact the nature and extent of the respondent's subsidization."  Id.  However, Commerce did not analyze whether the change of ownership actually affected Marsan's subsidy levels because that analysis is only appropriate in a full administrative review.  Id.

Ultimately, Commerce determined that Marsan's merchandise was not entitled to enter under the CVD cash deposit rate previously established for Gidasa.  Id. at 47,229.  Instead, Marsan's merchandise should enter under the "all others" cash deposit rate of 9.38 percent.  Id. Commerce published the Final Results of Marsan's CVD CCR on October 21, 2009, adopting its new successor-in-interest methodology for CVD CCRs, as well as the findings set forth in the Preliminary Results.

Marsan challenges Commerce's new CVD CCR successor-in-interest test as unlawful. Marsan also challenges Commerce's final determination that Marsan was not the successor to Gidasa for purposes of the CVD cash deposit rate, claiming it is not supported by substantial evidence and is unlawful.

### Jurisdiction and Standard of Review

This case deals with countervailing duty proceedings.  Plaintiff brought this action

pursuant to section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, 19 U.S.C. § 1516a(a)(2)(B)(iii)

(2006).  This Court has jurisdiction pursuant to section 201 of the Customs Court Act of 1980,

28 U.S.C. § 1581(c) (2006).

This Court must "uphold Commerce's determination unless it is 'unsupported by

substantial evidence on the record, or otherwise not in accordance with law.'"  Micron

Technology, Inc. v. United States, 117 F.3d 1386, 1393 (Fed. Cir. 1997) (quoting 19 U.S.C. §

1516a(b)(1)(B)(i) (1994)).  "Substantial evidence" means "more than a mere scintilla" and has

been characterized as "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion."  Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938) (citations

omitted).  "[T]he possibility of drawing two inconsistent conclusions from the evidence does not

prevent an administrative agency's finding from being supported by substantial evidence."

Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966) (citations omitted).  When reviewing

agency determinations, findings, or conclusions for substantial evidence, this Court determines

whether the agency action is reasonable in light of the entire record.  See Nippon Steel Corp. v.

United States, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006).  The Court must find evidence that

reasonably led to the agency's conclusion, ensuring it was a rational decision.  See Matsushita

Elec. Indus. Co. v. United States, 750 F.2d 927, 933 (Fed. Cir. 1984).

Commerce's interpretation of a statute is reviewed pursuant to the two-prong analysis

adopted by the Supreme Court in Chevron U.S.A., Inc. v.  Natural Res. Def. Council, Inc., 467

U.S. 837 (1984).  The first prong of the <u>Chevron</u> analysis requires the Court to determine

"whether Congress has directly spoken to the precise question at issue.  If the intent of Congress

is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the

unambiguously expressed intent of Congress."  <u>Id.</u> at 842-43.  However, if the statute is silent or

ambiguous, prong two of <u>Chevron</u> requires the Court to assess whether the agency's

interpretation of the statute is reasonable.  <u>Id.</u> at 843.

　　　"As long as the agency's methodology and procedures are reasonable means of

effectuating the statutory purpose, and there is substantial evidence in the record supporting the

agency's conclusions, the court will not impose its own views as to the sufficiency of the

agency's investigation or question the agency's methodology."  <u>Ceramica Regiomontana, S.A. v.</u>

<u>United States</u>, 10 CIT 399, 404-05, 636 F. Supp. 961, 966 (1986), <u>aff'd</u>, 810 F.2d 1137 (Fed. Cir.

1987).

### Discussion

### A. Commerce's Interpretation of Changed Circumstances Review Is Reasonable and the Successor-in-Interest Methodology Employed Therein Is in Accordance with Law

　　　Marsan asserts that "Commerce created a *per se* rule that, whenever there had been a

change in ownership since the most recently completed administrative review, the resulting

company would not qualify as successor to the old company."  Pl.'s Br. 11.  Marsan argues that

Commerce is, in effect, applying an irrebuttable presumption that a corporate acquirer brings

subsidies into the acquired company.  Marsan challenges Commerce's analysis because

"decision-making based on an irrebuttable presumption is irreconcilable with the requirement

that decisions be supported by substantial evidence . . . . " Pl.'s Br. 13.

In the reply brief, Marsan characterizes differently Commerce's alleged "irrebuttable

presumption." Marsan posits that "Commerce has adopted a criterion that a change in ownership

is *per se* a significant change. In other words, there is an irrebuttable presumption that a change

in ownership is a significant change." Pl.'s Reply Br. 2. Marsan asserts that "Chevron deference

does not allow Commerce to sidestep the substantial evidence requirement . . . . " Pl.'s Reply

Br. 6.; see Tariff Act of 1930, § 516A(b)(1)(B)(i), 19 U.S.C. § 1516a(b)(1)(B)(i). Therefore,

Marsan contends that Commerce must formulate criteria that provide an evidentiary basis for

making its determination as to whether there is an essential continuity between the pre-sale and

post-sale company.[4]

As Commerce noted, the statute authorizing Commerce to conduct a changed

circumstances review, 19 U.S.C. § 1675(b)(1), does not explicitly define what a CCR is or what

a CCR entails.[5] In fact, a CCR may address a broad range of matters and the only limitation in

the statute is the requirement that there be "changed circumstances **sufficient** to warrant a

review." See Mittal Canada, Inc. v. United States, 30 CIT 1565, 1572, 461 F. Supp. 2d 1325,

1332 n.7 (2006) (emphasis added). Thus, as Commerce pointed out, it has discretion to construe

---

[4] The Court notes the agency action also may have been challenged as arbitrary and capricious. See SKF USA Inc. v. United States, No. 07-CV-0393, 2011 U.S. App. LEXIS 324, at *17-18 (Fed. Cir. Jan. 7, 2011) (noting that a change in agency practice requires adequate explanation and laying out the factors to consider when determining whether agency action is arbitrary and capricious). However, the Plaintiff did not raise that issue. Therefore, the Court will not address it.

[5] Section 751(b)(1) of the Tariff Act of 1930, 19 U.S.C. § 1675(b)(1) provides that Commerce shall conduct a review of a determination whenever the administering authority receives information concerning, or a request from an interested party for a review of a final affirmative determination that resulted in a countervailing duty order which shows changed circumstances sufficient to warrant a review of such determination.

the breadth of CCRs because statutory silence provides "an express delegation of authority to the

agency to elucidate a specific provision of the statute by regulation." See Chevron, 467 U.S. at

843-44.

In matters of statutory construction, the Court will accord "great deference to the

interpretation given the statute by the officers or agency charged with its administration." Koyo

Seiko Co., Ltd. v. United States, 31 CIT 1512, 1514, 516 F. Supp. 2d 1323, 1329 (2007) (quoting

Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L. Ed. 2d 616 (1965)), aff'd, 551 F.3d 1286

(Fed. Cir. 2008).  Specifically, the Court must defer to Commerce's reasonable interpretation of

the antidumping and countervailing duty statute. See Hangzhou Spring Washer Co., Ltd. v.

United States, 29 CIT 657, 659, 387 F. Supp. 2d 1236, 1240 (2005).  In order to survive judicial

scrutiny, Commerce's construction need not be the only reasonable interpretation or even the

most reasonable interpretation.  See Zenith Radio Corp. v. United States, 437 U.S. 443, 450, 57

L. Ed. 2d 337, 98 S. Ct. 2441 (1978).

Commerce argues that its CVD CCR successor-in-interest methodology is a reasonable

interpretation of 19 U.S.C. § 1675(b)(1) because Commerce articulated well-grounded reasons

for implementing a new successor-in-interest methodology in CVD CCRs, it identified concrete

factors for its methodology, and it related those factors to the purposes and limitations of CCRs.

Commerce notes that the statute does not require the standards and analysis used in an AD CCR

to parallel those used in a CVD CCR. See 19 U.S.C. § 1675(b)(1).  Moreover, Commerce

highlights that the AD successorship analysis focuses on pricing, which is not relevant in the

CVD context because subsidization is the focus.

### 1. Commerce's Interpretation of Changed Circumstances Review Is Reasonable

Commerce interpreted a CCR addressing successorship as a review in which it only analyzes whether an alleged successor company is essentially the same entity as *(i.e.*, virtually unchanged from) an alleged predecessor company such that it succeeds to it for purposes of an existing AD or CVD order. Commerce's interpretation that a CVD CCR need only examine the **changes** to the company that could impact subsidy levels is reasonable because only certain types of changes to a company may render it different from a former company such that it is inappropriate to apply the CVD cash deposit rate of the former company to the new company.

Commerce underscores that it would be "infeasible and inappropriate for it to conduct a fact-intensive analysis of the extent to which significant changes affect a company's subsidization level, and that such an analysis is the province of a full administrative review." Def.'s Br. 17. Thus, when Commerce conducts a CCR to determine whether a company is entitled to a previously calculated CVD cash deposit rate, it is reasonable for Commerce to refrain from delving into an analysis of subsidization because that requires deeper analysis, appropriate for a full administrative review. Therefore, Commerce's interpretation of "changed circumstances review," including its construction that it is a review limited in scope and purpose, is reasonable.

### 2. Commerce's CVD CCR Successor-in-Interest Methodology Is in Accordance with Law

Pursuant to Commerce's reasonable interpretation of a CCR, it devised a methodology for CVD CCRs focusing on successorship. It has been recognized that the antidumping statute "reveals tremendous deference to the expertise of the Secretary of Commerce in administering

the anti-dumping law." <u>Fujitsu General Ltd. v. United States</u>, 88 F.3d 1034, 1039 (Fed. Cir.

1996) (citations omitted).  In fact,

> [t]his deference is both greater than and distinct from that accorded the agency in
> interpreting the statutes it administers, because it is based on Commerce's technical
> expertise in identifying, selecting and applying methodologies to implement the dictates
> set forth in the governing statute, as opposed to interpreting the meaning of the statute
> itself where ambiguous.

<u>Id.</u>  Therefore, this Court will not question Commerce's methodology "[a]s long as the agency's

methodology and procedures are reasonable means of effectuating the statutory purpose."

<u>Hangzhou</u>, 387 F. Supp. 2d at 1240.  In addition, if Commerce has discretion to create a

methodology, Commerce may revise it, and this Court will uphold the revised methodology if it

is reasonable.  <u>See</u> <u>Koyo Seiko Co., Ltd.</u>, 516 F. Supp. 2d at 1331.

　　As this Court previously noted, the "successor-in-interest analysis was not explicitly

created by statute or by regulation, but is an agency practice designed to facilitate the proper

implementation of the [trade] laws." <u>East Sea Seafoods, LLC v. United States</u>, 34 CIT ___ , ___,

703 F. Supp. 2d 1336, 1352 (2010).  Thus, the successor-in-interest analysis is precisely the type

of methodology Commerce is tasked with identifying and applying, and the Court must not

direct Commerce on how to create that methodology.  Rather, the Court must defer to

Commerce's methodology if it is reasonable.  <u>See</u> <u>JTEKT Corp. v. United States</u>, 33 CIT ___,

___, 675 F. Supp. 2d 1206, 1219 (2009).

　　As early as 2006, Commerce stated that it was considering changing the successor-in-

interest analsysis for CVD CCRs.[6]  Commerce noted it was not appropriate to use the same

---

[6] <u>Stainless Steel Sheet and Strip in Coils from the Republic of Korea: Preliminary Results of Countervailing Duty Changed Circumstances Review</u>, 71 Fed. Reg. 75,937 (Dep't Commerce Dec. 19, 2006).

analysis for AD and CVD CCRs, given that AD and CVD determinations focus on different

issues.  In 2007, Commerce published a notice requesting comments on its plan to change the

CVD successor-in-interest methodology.  Then, in the <u>Notice of Initiation</u> for this case,

Commerce clearly stated it would not be utilizing the former successor-in-interest criteria in

Marsan's CVD CCR.  Finally, in the <u>Preliminary Results</u> of the present case, Commerce

summarized the comments it received, articulated its reasons for implementing a new

methodology, and provided the specific criteria applicable.  Commerce asserts that its revised

criteria better address the focus (*i.e.*, subsidization) of a successor-in-interest analysis in the

CVD context than the factors examined in the AD context because the new criteria better reflect

those aspects of a company that generally are the most impacted by, the target of, or the vehicle

for subsidy benefits.  In light of the foregoing, and for the following reasons, Commerce's CVD

successor-in-interest methodology is reasonable.

Marsan challenges Commerce's CVD CCR successor-in-interest methodology as

unlawful, claiming it constitutes decision-making by irrebuttable presumption.  Marsan asserts

that <u>Delverde SRL v. United States</u> held decision-making by irrebuttable presumption unlawful,

by stating:

> [the Court] ha[s] come to the conclusion that the Tariff Act as amended does not allow
> Commerce to presume conclusively that the subsidies granted to the former owner of
> Delverde's corporate assets automatically "passed through" to Delverde following the
> sale. Rather, the Tariff Act requires that Commerce make such a determination by
> examining the particular facts and circumstances of the sale and determining whether
> Delverde directly or indirectly received both a financial contribution and benefit from a
> government.

202 F.3d 1360, 1364 (Fed. Cir. 2000).  However, the Court in Delverde also stated that "before

Commerce imposes a countervailing duty on merchandise imported into the United States, it

must determine that a government is providing, directly or indirectly, a countervailable subsidy

with respect to the manufacture, production, or export of that merchandise."  Id. at 1365.  More

specifically, the Court read the portion of the statute at issue in that case as "plainly requiring

Commerce to make a determination that a purchaser of corporate assets received both a financial

contribution and benefit from a government, albeit indirectly through the seller, before

concluding that the purchaser was subsidized."  Id. at 1367.

Thus, Delverde addressed Commerce's methodology for analyzing subsidization and

levying countervailing duties in the course of a CVD investigation.[7]  In this case, on the other

hand, the methodology at issue is applied in the context of a CCR; Commerce did not assess

subsidization or make a countervailing duty determination.  Therefore, Commerce did not

presume that subsidies granted to a seller passed through to the purchaser or conclude that

Marsan was subsidized.  Ultimately, "[t]he question in a successor-in-interest determination is

whether an alleged successor should qualify for the cash deposit rate last calculated for the

alleged predecessor."  East Sea Seafoods, 703 F. Supp. 2d at 1352.  Here, Commerce utilized its

methodology to answer that question.

Commerce's methodology simply evaluates the **changes** to a company to determine

whether those changes would make it inappropriate to treat the former and subsequent company

---

[7] In Delverde, the plaintiff challenged Commerce's methodology, which assumed that a pro rata portion of the
former owner's nonrecurring subsidies "passed through" to Delverde as a consequence of the sale, as erroneous and
inconsistent with the Tariff Act as amended by the Uruguay Round Agreements Act. Id. at 1363.

as if they were the same entity and entitled to the same cash deposit rate.  As Commerce

explained, subsidization often seeks to stabilize a company's financial position or facilitate

investment.  Thus, changes in a company's name, ownership, or structure because of corporate

reorganization, merger, or acquisition by another company are relevant to subsidy benefits.

Accordingly, a methodology that examines whether a company underwent these types of

changes to determine whether the company is entitled to the CVD cash deposit rate Commerce

assigned to the former company is reasonable.  If, as here, the changes indicated the companies

are not the same entity, the "all others" rate would be assigned until the respondent requested a

full administrative review to determine its specific rate.

   Thus, contrary to Marsan's assertions, the successor-in-interest methodology does not

entail an irrebuttable presumption that the corporate acquirer has subsidies because the analysis

is not focused on the company's subsidization.  Moreover, the governing principle of Delverde,

that Commerce could not conclusively presume subsidization, is inapplicable because

Commerce's methodology does not determine, analyze, or presume subsidization.  Instead, the

methodology examines the changes that warranted the CCR.  The methodology also does not

entail an irrebuttable presumption that any change constitutes a significant change.  The analysis

simply focuses on certain changes to a company that would make it inappropriate to treat the old

and new company similarly for purposes of the CVD order.

   Therefore, the successor-in-interest methodology in a CVD CCR, which concentrates on

whether there were significant changes to a company's operations, ownership, corporate, or legal

structure to determine whether the changed company may receive a previously calculated CVD

cash deposit rate, is reasonable and in accordance with law.

### B. Commerce's Determination that Marsan Is Not the Successor to Gidasa for CVD Cash Deposit Purposes Is Supported by Substantial Evidence and Otherwise in Accordance with Law

Marsan argues that "Commerce simply leapt from the fact of the acquisition to the

conclusion that the post-acquisition company probably had subsidies even though it had none

prior to the acquisition, with no evidentiary basis whatsoever and only its new irrebuttable

presumption as rationale." Pl.'s Br. 15. Marsan contends that Commerce did not make any

effort to determine whether the purchaser brought any subsidies. According to Marsan,

Commerce's only factual analysis was to find that Marsan had acquired Gidasa.[8] Thus, Marsan

claims that "in the absence of any evidence or reason to believe that the transfer of ownership

brought any subsidies into the company, Commerce could not lawfully determine that Marsan

was not the successor to Gidasa for purposes of the CVD CCR." Pl.'s Br. 22.

In support of Marsan's claim that it was the successor-in-interest to Gidasa, Marsan

stresses that it had the same productive facilities as Gidasa, it was in the same line of business as

Gidasa, and the sale was a private-to-private transaction with a holding company whose sole

asset was the shares of Marsan. Marsan asserts that these facts demonstrate a continuity of

structure, function, and operations between Gidasa and Marsan.

---

[8] Specifically, Marsan asserts that Commerce never considered that Gidasa did not have subsidies according to its most recent review, that there was no possibility of any infusion of domestic subsidies, that the holding company that acquired Gidasa did not have subsidies, or that a review of recent Turkish CVD cases establishes that there is little or no likelihood of subsidies applicable.

Marsan's arguments that Commerce did not find that Marsan had subsidies and that

Marsan had similar productive facilities, customers, and suppliers are misplaced.  Pursuant to

Commerce's reasonable interpretation of a CCR, the review was limited to an analysis of

successorship, not subsidization, which is analyzed in a full administrative review.  In addition,

pursuant to Commerce's expertise, it reasonably determined that an analysis of productive

facilities, customers, and suppliers is relevant to an AD determination, whereas the company's

ownership and assets are relevant to a CVD determination.  Thus, the Court only determines

whether Commerce's final determination is supported by substantial evidence on the record.  See

Tariff Act of 1930, § 516A(b)(1)(B)(i), 19 U.S.C. § 1516a(b)(1)(B)(i) (2006).  Substantial

evidence review essentially inquires into the reasonableness of the determination.  See Nippon

Steel Corp., 458 F.3d at 1351.

As Commerce explained, it examined information Marsan submitted which shows

evidence of a significant change in ownership and corporate structure.  Marsan contends that the

"evidence in the present case establishes that Marsan is substantially identical to its predecessor,

Gidasa, and Commerce's refusal to consider that evidence resulted in a decision based on

speculation rather than substantial evidence."  Pl.'s Reply Br. 12.  However, Commerce argues

that regardless of the factors Marsan claims demonstrate it is the successor, the record supports

Commerce's decision to the contrary.  According to Commerce, even if the Court considered the

information Marsan offers to support its claim of successorship, substantial evidence still

supports Commerce's conclusion because the record demonstrates that Marsan underwent

significant changes, and therefore, was not the successor to Gidasa for CVD cash deposit

purposes.  Indeed, if there is evidence that reasonably led to Commerce's conclusion, such that it

was a rational decision, the conclusion is supported by substantial evidence.  See Matsushita

Elec. Indus. Co., 750 F.2d at 933.

By requesting a CCR, Marsan acknowledged it could not automatically succeed to

Gidasa's CVD cash deposit rate without a declaration by Commerce that it is essentially the

same entity as Gidasa and thus entitled to similar treatment.  In fact, without such a

determination, Marsan's merchandise would automatically enter under the "all others" rate, the

rate applicable to companies that have not been reviewed, until there was an administrative

review to determine the new or changed company's specific rate.  Thus, the CCR was necessary

to examine the changes that occurred in order for Commerce to determine whether it could treat

Marsan as it had treated Gidasa.  There is not a guarantee that a CCR will result in an affirmative

finding of successorship.

In this case, Commerce made a negative determination as to Marsan's successorship

status because there is substantial evidence to support the conclusion that the two companies,

Gidasa and Marsan, are not the same entity.  The record shows that the ownership of Gidasa

changed, as well as its name.  A change in ownership is a significant change because it entails

different assets and a different corporate identity, which are relevant to subsidization.  Thus, the

change in ownership is "such relevant evidence as a reasonable mind might accept as adequate to

support" the conclusion that Marsan is not the successor to Gidasa for CVD cash deposit

purposes.  See Consol. Edison Co., 305 U.S. at 229.

### Conclusion

Commerce's interpretation of "changed circumstances review" is reasonable, the methodology it employed therein is in accordance with law, and its final determination is supported by substantial evidence.

For the foregoing reasons, Marsan's motion for judgment upon the agency record is denied and judgment is entered in favor of the United States.

/s/ Richard W. Goldberg
Richard W. Goldberg
Senior Judge

Dated: February 16, 2011
New York, New York

## UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr><td>

MARSAN GIDA SANAYI VE TICARET
A.S.,

      Plaintiff,

   v.

UNITED STATES,

      Defendant.

</td><td>

Before: Richard W. Goldberg,
Senior Judge
Court No. 09-00483

</td></tr>
</table>

### JUDGMENT

Upon consideration of Plaintiff's Motion for Judgment on the Agency Record and the

memoranda and accompanying materials in support thereof, and the opposition and supporting

materials thereto, and upon all the other papers and proceedings had herein, it is hereby

ORDERED that Plaintiff's motion be, and hereby is, denied; and it is further

ORDERED that judgment is hereby entered in favor of Defendant.

         /s/ Richard W. Goldberg
         Richard W. Goldberg
         Senior Judge

Dated: February 16, 2011
New York, New York